AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | FILED<br>CLERK, U.S. DISTRICT COURT |
|---|---|
| | 07/11/2022 |
| | CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ cj _____ DEPUTY |

United States of America

          Plaintiff

       v.

DANIEL NAVARRO
JULIE LE

          Defendants.

Case No.   2:22-MJ-2689-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of July 11, 2022, in the county of San Luis Obispo in the Central District of California, defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(a) | Transportation with Intent to Engage in Criminal Sexual Activity with a Minor |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Brian J. Sullivan
*Complainant's signature*

_____
FBI Special Agent Brian J. Sullivan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    July 11, 2022

_____
*Judge's signature*

City and state:    Santa Barbara, California

Honorable Louise A. LaMothe, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Brian P. Sullivan, being duly sworn, declare and state as follows:

**I. PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrants charging Daniel NAVARRO ("NAVARRO") and Julie LE ("LE") with a violation of 18 U.S.C. § 2423(a) (Transportation with Intent to Engage in Criminal Sexual Activity with a Minor).

2.    This affidavit is also made in support of an application for a warrant to search:

a.    A 2017 black Honda Civic, California License Plate Number 8BSB973, and Vehicle Identification Number ("VIN") 2HGFC2F73HH577891, registered to Julie LE ("LE") (the "SUBJECT VEHICLE"), as described more fully in Attachment A-1[1];

b.    The person of Daniel NAVARRO ("NAVARRO"), as described more fully in Attachment A-2;

c.    The person of LE, as described more fully in Attachment A-3; and

d.    Five digital devices seized from the SUBJECT VEHICLE by law enforcement on July 10, 2022, as described more fully in Attachment A-4 (the "SUBJECT DEVICES").

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of: §§ 2423(a) (Transportation with Intent to Engage in Criminal

_____

[1] Contingent upon the arrival of the SUBJECT VEHICLE in the Central District of California.

Sexual Activity with a Minor)); 2422(b) (Enticement of a Minor
to Engage in Criminal Sexual Activity); 2251(a), (e) (Attempted
Production of Child Pornography) (the "Subject Offenses"), as
described more fully in Attachment B, which is incorporated
herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
search warrant, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since January
2003.  I am currently assigned to the Los Angeles Field Office,
Central Coast Safe Street Taskforce ("CCSSTF").  CCSSTF is a
task force comprised of agents and officers from federal, state,
and local agencies, who are assigned to investigate gang-related
crimes and large-scale drug trafficking matters.  Additionally,
I currently serve as a Team Leader on the FBI's Child Abduction
Rapid Deployment ("CARD") team which specializes in locating
kidnapped, abducted, and missing children throughout the United
States.  I have served as a member of CARD for approximately the

past ten years as and as a team leader for the past approximate five years.  In this capacity, I have received hundreds of hours of training and have participated in more than fifteen enforcement actions related to kidnapped, abducted, or otherwise missing children.

6.    In my capacity as an FBI agent, I have also assisted in investigations related to violations of federal law related to child exploitation, child pornography, and sexual enticement of a minor.  I have also participated in the execution of numerous search warrants, many of which involved child exploitation and/or child pornography offenses.

7.    Through my training and experience, I have become familiar with the methods of operation used by people who are involved with offenses involving the sexual exploitation of children.  I have attended training classes and seminars concerning computer crimes and the sexual exploitation of children on the Internet.  This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses.  My experience in investigations in this regard has supplemented my understanding of how people involved in offenses relating to the sexual exploitation of children use the Internet to further those offenses.  Through my training and experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children and how people use the Internet to

commit crimes arising from, and related to, the sexual exploitation of children.

### III. TRAINING AND EXPERIENCE ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK, AND DEFINITION OF TERMS

8.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

9.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    File Storage.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or

on virtual servers accessible from any digital device with an
Internet connection (i.e., "cloud storage").  Computer users
frequently transfer files from one location to another, such as
from a phone to a computer or from cloud storage to an external
hard drive.  Computer users also often create "backup," or
duplicate, copies of their files.  In this way, digital child
pornography is extremely mobile and such digital files are
easily reproduced and transported.  For example, with the click
of a button, images and videos containing child pornography can
be put onto external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied onto
compact disks and/or stored on mobile digital devices, such as
smart phones and tablets.  Furthermore, even if the actual child
pornography files are stored on a "cloud," files stored in this
manner can only be accessed via a digital device.  Therefore,
viewing this child pornography would require a computer,
smartphone, tablet, or some other digital device that allows the
user to access and view files on the Internet.

      c.   <u>Internet</u>.  The term "Internet" is defined as the
worldwide network of computers -- a noncommercial, self-
governing network devoted mostly to communication and research
with roughly 500 million users worldwide.  The Internet is not
an online service and has no real central hub.  It is a
collection of tens of thousands of computer networks, online
services, and single user components.  In order to access the
Internet, an individual computer user must use an access
provider, such as a university, employer, or commercial Internet

Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

        d.   Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

        e.   IP Addresses.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has

one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

## IV. TRAINING AND EXPERIENCE ON INSTAGRAM

10.  Based on my training and experience, knowledge of the investigation, information provided by other law enforcement officers, and review of publicly available information, I know the following.

a.    Instagram owns and operates a free-access social-networking website.  Instagram allows its users to create their own profile pages, which can include a short biography, or "bio," a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

b.    Instagram permits users to post photos and videos to their profiles on Instagram and otherwise share photos and videos with others on Instagram, as well as certain other

social-media services, including Flickr, Facebook, and Twitter.
When posting or sharing a photo or video on Instagram, a user
can add the following to the photo/video: a caption; various
"tags" that can be used to search for the photo/video (e.g., a
user may add the tag "#vw" so that people interested in
Volkswagen vehicles can search for and find the photo/video);
location information, including geotags or a specific location
name; and other information.  A user can also apply a variety of
"filters" or other visual effects that modify the look of the
posted photos and videos.  In addition, Instagram allows users
to make comments on posted photos and videos, including photos
and videos that the user posts or photos and videos posted by
other users of Instagram.  Users can also "like" photos and
videos, meaning that they can express approval of a photo or
video by using Instagram's "like" feature.

     c.   Instagram allows users to have "friends," which
are other individuals with whom the user can share information
without making the information public.  Friends on Instagram may
come from either contact lists maintained by the user, other
third-party social media websites and information, or searches
conducted by the user on Instagram profiles.  Instagram collects
and maintains this information.

     d.   Instagram also allows users to "follow" another
user, which means that they receive updates about posts made by
the other user.  Users may also "unfollow" users, that is, stop
following them or block them, which prevents the blocked user
from following that user.

e.   Instagram allows users to post and share various types of user content in their galleries, including photos, videos, captions, comments, and other materials.  Such items can contain metadata, i.e., content about the data such as the date and time the photo or video was taken.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

f.   Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

g.   Instagram users may also make audio or video calls to other Instagram users.

## V.  <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   July 1, 2022 – A.T.'s Mother Reports Her Missing

12.  On July 1, 2022, around 6:30 a.m., San Luis Obispo County Sheriff's Office ("SLOSO") deputies responded to a runaway juvenile report at a residence in Nipomo, California. P.L. reported that her step-granddaughter, fifteen-year-old minor victim A.T., had been staying with P.L. for the past two months.  On the morning of July 1, 2022, around 1:00 a.m., a Ring camera captured footage of A.T. sneaking out the front door of P.L.'s residence.  P.L. did not know where A.T. had gone, and A.T. had not returned.  A.T. did not have any known friends in

the area.[2]  A.T. was aware that her family was planning to throw A.T. a quinceañera party on July 2, 2022, the day after she disappeared.  P.L. stated that the quinceañera party was very important to A.T.

13.    Deputies contacted A.T.'s father, C.T., who resides in Santa Maria.  C.T. did not know his daughter's whereabouts. Deputies also contacted A.T.'s mother, J.C., who resides in Arizona.  J.C. did not know her daughter's whereabouts.

14.    After receiving the report, SLOSO deputies searched the South San Luis Obispo County area and issued a "Be On the Lookout" ("BOLO") for A.T.

**B.    July 3, 2022 – SLOSO Detectives Interview A.T.'s Cousin, J.D., and Learn That A.T. Had an Online Relationship with An Older Man**

15.    On July 3, 2022, SLOSO detectives spoke to J.D., A.T's cousin, in Nipomo, California.  J.D.'s father, V.D., was present during the interview.  During the interview, J.D. provided the following information:

a.    J.D. said that she lives in Santa Maria but frequently stayed with A.T. at their grandmother's, P.L.'s, residence in Nipomo, California.  J.D. told detectives about a person who she knew as "Angel" who could be involved in A.T.'s disappearance.

b.    J.D. first learned of "Angel" approximately one year ago.  J.D. was having a sleepover with A.T. at P.L.'s residence when she overheard A.T. speaking to a male voice on

_____

[2] Investigators later learned A.T.'s primary residence during the school year is in Arizona where A.T.'s mother lives; A.T. lives with her father in California during the summer.

her phone through Instagram. J.D. asked A.T. who she was speaking to, and A.T. responded that the person was a friend. J.D. could hear the male asking A.T. why A.T. was in California rather than Arizona. J.D. also said that the male sounded "mad" that A.T. was in California.

      c.   A.T. did not initially identify the man but later told J.D. that his name was "Angel" and that he was 15 years old. A.T. only said that she had met "Angel" through her brother who had in turn met him through a video game. J.D. said that A.T. had never seen "Angel" because he refused to show his face. "Angel" only communicated through text or voice contact.

      d.   J.D. began speaking to "Angel" herself, separate from A.T., in March 2022 after A.T. used J.D.'s cell phone to contact "Angel." "Angel" began separately communicating with J.D. by text on J.D.'s cell phone number. J.D. thought "Angel" was Hispanic because he spoke primarily English with some Spanish. J.D. also thought that "Angel" was older because he used "big words" and did not understand slang or "teen words."

      e.   "Angel" primarily used phone number (213) 349-3752 to contact J.D. but also used number (707) 884-0322.[3]

      f.   During March or April 2022, "Angel" contacted J.D. and asked if J.D. wanted to run away. "Angel" said that he

---

[3] Sheriff's Detectives later used software available to law enforcement to help identify the possessor of these phone numbers. Detectives learned that both numbers were Voice Over Internet Protocol ("VOIP") numbers which deliver voice communication or text messages over internet service bypassing the need or requirement for cellular service or traditional landline communication systems. These phone numbers are often difficult to track or trace to a specific location because they can be accessed from any internet accessible location.

and J.D. could go places and "do things." J.D. replied "no." When "Angel" asked why, J.D. stopped responding. About six minutes later, A.T. asked J.D. why she was being mean to "Angel." J.D. said she was not going to run away with anyone. A.T. told J.D. that J.D. did not need to run away with "Angel," they could just hang out. J.D. did not hear from "Angel" for the next month.

g. Approximately three days before A.T. went missing, "Angel" re-established contact with J.D. "Angel" told J.D. she had not heard from him because he was busy and had a family problem he had to fix "before something happened."

h. J.D. was present at the Santa Maria Mall with A.T. on June 29, 2022, two days before A.T. disappeared, when A.T. spoke with "Angel" through Instagram. A.T. used her Instagram account for communication because her regular cellular service was not activated at that time. A.T. also occasionally uses Snapchat to communicate.

i. "Angel" spoke to A.T. more often than he did with J.D. A.T. trusted "Angel" and would answer his questions directly.

j. About one week ago, J.D. and A.T. realized that "Angel" was speaking to them through different Instagram accounts. "Angel" used Instagram account "dn84831" to contact A.T. This account used by "Angel" displayed username "D N" and displayed a 49ers logo next to his username. Angel used Instagram account "t.707.dn" to communicate with J.D. This account used by "Angel" also displayed username "D N" but had a

blank icon next to his user name.  J.D. was present when A.T.
spoke to "Angel" through A.T.'s Instagram so J.D. knew "Angel"
was the same person using two separate Instagram accounts.

k.    On June 30, 2022, the day before A.T.
disappeared, J.D. spoke to "Angel" on the phone.  At the
conclusion of the call, the phone connection became poor and
Angel stated he was going through a tunnel.

l.    J.D. attempted to contact "Angel" on the day A.T.
disappeared, at about 3:00 p.m.  The call went through, however,
"Angel" did not answer and J.D. did not leave a message.

m.    J.D. said that "Angel" went by the name Daniel.

n.    J.D. further said that A.T. was looking forward
to her quinceañera[4] which was supposed to take place the day
after her disappearance.  A.T. had already bought an expensive
dress and was counting down the days to her event.  J.D. was
very concerned that A.T. had not returned home because the
quinceañera was so important to her.

16.    On July 3, 2022, SLOSO Detectives interviewed the
victim's grandmother, P.L.  P.L. said that on the morning of
July 1, 2022, she got "Angel's" contact information from her
granddaughter, J.D., and texted "Angel" at (213) 349-3752.
"Angel" said that he did not know what P.L was talking about and
did not know where A.T. was.

---

[4] I know that a quinceañera is a traditional party held for
girls turning 15 in several cultures, including in America for
girls of Latina or Hispanic descent.  A quinceañera is the
equivalent of a "Sweet Sixteen" party.  It is considered an
important milestone in a child's life and is highly celebrated,
often with a large party.

**C.    A.T.'s Younger Sister, L.T., Confirms A.T.'s Involvement with "Daniel"**

17.    On July 3, 2022, around 2:00 p.m., SLOSO Detectives spoke with A.T.'s twelve-year-old sister, L.T.  During the interview, L.T. provided the following information:

a.    L.T. was very close to A.T.  A.T. spent most of her time in her bedroom on her phone looking at TikTok or Instagram.  A.T. did not have many real-life friends or friends at school.

b.    A.T. talks to a boy named "Daniel" all the time on Instagram.  Daniel was about the same age as A.T. but the two never met in person.  Daniel played the video game Roblox with A.T. and L.T.'s older brother.

c.    L.T. believed that Daniel lived in Los Angeles but had also traveled to and stayed in Mexico.  At some point, Daniel said he was shot and placed into a coma.  During this period, A.T. began speaking with a family member of Daniel's, though L.T. was not sure who.  L.T. showed detectives a picture of someone who L.T. believed was Daniel.  The picture depicted a teenage Hispanic male wearing a generic football jersey with no team or identifying insignia.

d.    A.T. kept her relationship and communications with Daniel a secret from her mother.  A.T. told her mother that Daniel was a friend from her school in Arizona but that was not true.  L.T. said that Daniel was the only secret that A.T. kept from her mother.

e.    On the night A.T. left, L.T. said she saw headlights of a vehicle pull up and stop across the street from P.L.'s residence, somewhere around 10:00 p.m. or 11:00 p.m. on June 30, 2022.  L.T. said she saw a large dark vehicle stopped on the other side of the street.  The car continued down the street and then turned around at the end of the street and drove back by the residence.

f.    When L.T. brought up the car driving down their street to A.T., A.T. told L.T. to go back to bed.  L.T. then saw A.T. get onto L.T.'s tablet and begin texting with someone.

g.    Since A.T. disappeared, L.T. reported that A.T.'s TikTok account has not had any activity.  L.T. thought that was odd because her sister was always on TikTok.

**D.    Instagram Provides Records Showing that NAVARRO Was "Angel" and That He Attempted to Entice A.T. to Have a Sexual Relationship**

18.    On July 4, 2022, the Honorable Gale Peron of the San Luis Obispo County Superior Court signed a search warrant for the three Instagram accounts associated with "Angel" that A.T. and J.D. identified as well as A.T.'s own Instagram account. Specifically, the accounts associated with "Angel" were "DN84831," "T.707.dn," and "dn.2021.01" (collectively, the "Navarro Accounts").

19.    On July 7, 2022, Instagram provided subscriber information related to the Navarro Accounts.  Each of the Navarro Accounts identified the subscriber as NAVARRO with a birthdate of January 18, 1984.  A search of California

Department of Motor Vehicles records for NAVARRO reveals that January 18, 1984, is his actual birthdate.

20.   A review of one of NAVARRO's Instagram accounts, "dn.2021.01," revealed conversations between NAVARRO and A.T. on A.T.'s Instagram account in which NAVARRO professed his love for A.T. and discussed having sex with A.T. in order to impregnate her.

a.   On February 8, 2022, A.T. and NAVARRO began to communicate online.  A.T. explicitly told NAVARRO that she was 14 years old and from Arizona.  The conversation quickly turned romantic.  The two began to call each other "baby" and profess their love for each other.

b.   On March 21, 2022, NAVARRO and A.T. had the following text exchange about A.T. bearing NAVARRO's child:

NAVARRO: Baby I want you so bad

NAVARRO: I want a baby

NAVARRO: Please

A.T.: Ok, I'll give u one.

NAVARRO: Really

NAVARRO: When do we start?

A.T.: When ever [sic] we can

. . .

NAVARRO: Ok do I cum inside you?

A.T.: Yea

NAVARRO: Ok baby

       c.   On March 26, 2022, NAVARRO and A.T. had the following exchange about NAVARRO getting pictures of A.T. in the shower:

> A.T.: I can't take long because my little cousin still has to take a shower
>
> NAVARRO: Ok baby
>
> NAVARRO: Dammmnnn baby
>
> NAVARRO: Booty
>
> NAVARRO: Damn baby
>
> A.T.: Baby
>
> NAVARRO: Pussy baby
>
> NAVARRO: Can I see you with legs open
>
> A.T.: Hold on baby
>
> NAVARRO: Dammmnnn baby
>
> . . .
>
> NAVARRO: Baby you're pussy looks bomb
>
> A.T.: Baby
>
> NAVARRO:I want you so bad
>
> A.T.: Can I see you
>
> NAVARRO: Play with your self [sic]

       d.   On the evening of her disappearance, NAVARRO and A.T. had a conversation about A.T. leaving with NAVARRO:

> A.T.: baby when you came did you see where all the cars are from our grandma's house
>
> A.T.: Will [sic] there is a door where the kinda where the cars are parked and there is another

door on the others side and there isn't a camera
there

. . .

A.T.: baby I'm sorry but I can't I'm not ready
feel like I'm abandoning baby . . .  and I can't
do that to them I'm sorry

  e. On July 1, 2021, at 12:10 a.m., just a few
minutes before A.T. left her grandmother's house, NAVARRO
messaged A.T., "you made me promises. remember to leave with me.
. . . what about making our baby."  A couple of minutes later,
NAVARRO messaged A.T.  "Juju is upset and can't believe we drove
all this way to hear your excuses."

  f. At 12:33 a.m., NAVARRO messaged A.T., "Juju is
driving back to you wtf."  A minute later, NAVARRO messaged,
"Wow juju has your back."  A.T. then messaged, "I'm not gonna
break the promise with you . . . I'm not gonna be so scared and
I'm not gonna stay . . . I'll go for real this time."

  g. At 12:38 a.m., NAVARRO messaged A.T., "We just
got here . . . Run to the corner."

 21. A review of NAVARRO's other Instagram account,
"dn84831," revealed additional communications between NAVARRO
and A.T. in which NAVARRO and A.T. said "I love you" to one
another.

 22. In the same account, NAVARRO communicated with other
females who identified themselves as 14- and 15-years-old.
NAVARRO told another 15-year-old female that he wanted her to
have his baby.  NAVARRO sent a photo of a penis to another 15-

year-old female.  NAVARRO also requested nude photographs from
multiple other 14- and 15-year-old females.

### E.   Instagram Records Show NAVARRO and LE Worked Together to Procure Underage Females for NAVARRO

23.   The Instagram account, "dn.2021.01," revealed
discussions between NAVARRO and another Instagram account,
"le.julie01," concerning underage females.  In the messages,
NAVARRO and "le.julie01" exchanged screen shots of social media
profiles associated with apparent underage females.  NAVARRO
then instructed "le.julie01" to message the underage females
associated with the various profiles informing the females that
NAVARRO was a friend.  NAVARRO referred to "le.julie01" as
"JuJu" during these conversations.

24.   The publicly accessible profile for "le.julie01"
showed a picture of a female in her late teens or early
twenties.  The profile identified "le.julie01" as a cheerleader
who graduated in 2019.  In March 2022, "le.julie01" sent NAVARRO
images of money order receipts that contained LE's name, her
address in Garden Grove, California, and her cell phone number,
(714) 482-8815 ("Le Cell").  California DMV records for LE
listed the same Garden Grove address as the one shown on the
money orders in the "le.julie01" account.  In response to a
search warrant, T-Mobile later identified the subscriber of Le
Cell as LE.

25.   Subsequent search of border crossing records revealed
that LE and NAVARRO crossed the United States-Mexico border
together on several occasions in 2022.

**F.    Ping Information for NAVARRO's and LE's Cell Phones Show That They Traveled to Nipomo at the Time of A.T.'s Disappearance and Then Traveled to Mexico**

26.    Instagram also provided information about the IP addresses that were used by NAVARRO to access the account, "dn.2021.01."  On June 30, 2022, this account used IP address 2607:fb90:73a0:6a10:04c6:bbd2:71ba:cca1 (the "Suspect IP Address") to log on to Instagram.  SLOSO Detectives used publicly accessible resources to determine that the Suspect IP Address was associated with T-Mobile.

27.    On July 7, 2022, the Honorable Barry T. LaBarera, San Luis Obispo County Superior Court, signed a search warrant directing T-Mobile to provide information about the Suspect IP Address.

28.    In response, T-Mobile stated that the Suspect IP Address was associated with NAVARRO's account.  The account listed NAVARRO's name, true date of birth, and cell phone number, (909) 331-7658 ("Navarro Cell").

29.    On July 7, 2022, the Honorable Gale Peron of the San Luis Obispo County Superior Court signed a warrant directing T-Mobile to provide historical GPS location information for Navarro Cell and Le Cell.  GPS location data for both Navarro Cell and Le Cell placed both phones in the Nipomo area near A.T.'s house around the time that A.T. disappeared, between midnight and 1:00 a.m. on July 1, 2022.  The phones then left the Nipomo area around 1:20 a.m. on July 1, 2022, were pinging in the area of a gas station in Santa Barbara, California, and then traveled the US-101 freeway into the Los Angeles area

ultimately arriving at the area of Chula Vista, California, near
the United States-Mexico border around 6:20 a.m. on July 1,
2022.

### G. NAVARRO and LE Return to the United States, Are Arrested, and Admit They Took A.T. from Nipomo and Transported Her to Mexico

30.    On July 10, 2022, around 9:30 p.m., LE and NAVARRO
crossed the border into the United States from Mexico driving in
the SUBJECT VEHICLE together.  Both were detained on outstanding
arrest warrants issued by the San Luis Obispo County Superior
Court.

31.    Detectives <u>Mirandized</u> both NAVARRO and LE and both
agreed to speak with detectives.

a.    LE stated that she and NAVARRO had developed an
online relationship with A.T. over social media.  LE knew that
A.T. had recently turned 15 years of age.  LE learned that A.T.
was not happy in her home environment, so she and NAVARRO drove
to A.T.'s residence where they picked up A.T. and transported
her across the border into Mexico.  LE and NAVARRO had A.T.
conceal herself in the back seat of their car so she would not
be detected.  LE said that she and NAVARRO had taken A.T. to
NAVARRO's father's residence in Mexico.

b.    NAVARRO told law enforcement that he had gone to
a city starting with the letter "N" in California in late June
or early July 2022.  NAVARRO further admitted that he and LE had
taken A.T. to NAVARRO's father's residence in Mexico.

**H. Law Enforcement Recovers the SUBJECT DEVICES from the SUBJECT VEHICLE**

32. Upon their arrival at the border on July 10, 2022, law enforcement searched the SUBJECT VEHICLE and recovered the SUBJECT DEVICES from the car.

**I. July 11, 2022 – Law Enforcement Recovers A.T. from NAVARRO's Father's House in Mexico**

33. On July 11, 2022, SLOSO detectives spoke with M.L., who is NAVARRO's ex-wife with whom she shares custody over their two children. M.L. said that NAVARRO and LE had picked up M.L. and NAVARRO's two kids on July 8, 2022, and brought them to NAVARRO's father's house in Tijuana, Mexico.

34. M.L. sent law enforcement videos of her children that LE had taken on her cell phone and sent to M.L. on July 8 and 9, 2022. The videos were date and time stamped and had geolocation data associated with each video, including the latitude and longitude where they were taken. Detectives used Google Earth to locate the area associated with the videos and obtained a map of that area. Detectives showed the map to LE who confirmed that the map showed NAVARRO's father's residence where A.T. was currently.

35. Later that evening, Mexican law enforcement went to NAVARRO's residence, found A.T., and took her into protective custody. A.T. is expected to be reunited with her father soon.

**VI. TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN**

36. Based on my training and experience, and the training and experience of other law enforcement officers with whom I

have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

c.    Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities. Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

d.    Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – on the SUBJECT DEVICES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools. Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT DEVICES could lead to evidence of the child exploitation offenses.

e.    Individuals who have a sexual interest in children will often use female friends, acquaintances, or

girlfriends to communicate with, and gain the trust of, young
girls before sexually exploiting them.  By using a female
friend, the individual with a sexual interest in children will
put a potential victim at ease and normalize the individual's
sexual interest in the child victim.

### VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

37.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

---

[5] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

38.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

39.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

40.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress NAVARRO's or LE's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of NAVARRO's or LE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

42.   For all of the reasons described above, there is probable cause to believe that NAVARRO and LE have committed a violation of 18 U.S.C. § 2423(a) (Transportation with Intent to Engage in Criminal Sexual Activity with a Minor).  There is also probable cause that the items to be seized described in Attachment B for the SUBJECT OFFENSES will be found in a search of the vehicle, persons, and devices in Attachments A-1, A-2, A-3, and A-4.

_____

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 11th day of
July, 2022.

_____
HON. LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE